U.S. DISTRICT COURT
EASTERN DISTRICT-FI
FILED
2012 DEC 18 A 11: 41
JON W. SANFILIPPO
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 12-CR-

**12 -CR262**

JAMES SCALZO,

Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Assistant United States Attorney, and the defendant, James Scalzo, individually and by attorney Michael J. Cohn, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a 2-count information, which alleges violations of Title 18, United States Code, Sections 1344(2) and 1956(1)(a)(B)(i) and 2.

3.     The defendant has read and fully understands the charges contained in the information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.      The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

**THE UNITED STATES ATTORNEY CHARGES:**

(1)      Between on or about April 1, 2008, and on or about October 31, 2009, in the State and Eastern District of Wisconsin and elsewhere,

**JAMES SCALZO**

did knowingly devise and execute a scheme to obtain money, funds, and credits from federally insured financial institutions by means of materially false and fraudulent pretenses, representations and promises.

**Background**

(2)      During this time period, Scalzo was consecutively employed as a bank officer at Fox River State Bank (FRSB), Burlington, Wisconsin, and Consumer's Credit Union (CCU), Round Lake Beach, Illinois.

(3)      The deposits of Fox River State Bank are insured by the Federal Deposit Insurance Corporation and the deposits of Consumer's Credit Union are insured by the National Credit Union Share Insurance Fund.

**Scheme to Defraud**

(4)      Between April 1, 2008, and October 31, 2009, in the State and Eastern District of Wisconsin and elsewhere, James Scalzo, acting as a bank officer, originated and approved multiple loans, most in the form of lines of credit, for unknowing and/or unqualified borrowers without supporting financial information or collateral.

2

(5)     As part of the scheme to defraud, James Scalzo forged borrower signatures on loan file documents.

(6)     As a further part of the scheme to defraud, James Scalzo directed that funds be taken from the loans and transferred, by cashier's check or wire, without the knowledge of the named borrower, to accounts in which Scalzo had a personal interest.

(7)     As a further part of the scheme to defraud, James Scalzo directed that funds be taken from the fraudulent loans to be applied against balances due on previously originated fraudulent loans, in order to conceal fraud in the origination of those loans.

(8)     The loans that Scalzo originated as part of the scheme include:

| Date | Financial Institution | Borrower | Amount |
|------|----------------------|----------|--------|
| April 25, 2008 | Fox River State Bank | N.N. | $85,000 |
| June 24, 2008 | Fox River State Bank | S.N. | $100,000 |
| June 25, 2008 | Fox River State Bank | P.D. | $230,000 |
| July 25, 2008 | Fox River State Bank | C.P. | $125,000 |
| August 1, 2008 | Fox River State Bank | N.N. | $145,000 |
| October 13, 2008 | Fox River State Bank | C.P. | $158,000 |
| July 31, 2009 | Consumer's Credit Union | N.N. | $135,000 |
| September 5, 2009 | Consumer's Credit Union | C.P. | $230,000 |
| October 2, 2009 | Consumer's Credit Union | P.D., Sr. | $250,000 |

3

## Execution of the Scheme

## COUNT ONE: BANK FRAUD

**THE UNITED STATES ATTORNEY FURTHER CHARGES:**

(9)　　On or about August 1, 2008, in the State and Eastern District of Wisconsin, James Scalzo, acting as a bank officer at Fox River State Bank, for the purpose of executing the above described scheme to defraud, knowingly and fraudulently originated a line of credit in the amount of $145,000, in the name of an LLC registered to N.N., without having obtained the approval of N.N., and by forging the signatures of N.N. and his wife on the loan origination documents.

　　　　All in violation of Title 18, United States Code, Section 1344(2).

## COUNT TWO : MONEY LAUNDERING

**THE UNITED STATES ATTORNEY FURTHER CHARGES:**

(10)　　On or about July 15, 2009, in the State and Eastern District of Wisconsin, and elsewhere,

### JAMES SCALZO,

knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted a financial transaction which in fact involved the proceeds of specified unlawful activity, namely bank fraud, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, source, and control of the proceeds of specified unlawful activity.

4

(11)    Specifically, the defendant caused the wiring of $20,000, originally derived from a line of credit that he had fraudulently obtained in the name A.S. at the Citizen's Bank of Mukwonago.

(12)    The defendant caused the funds to be wired from a TCF Bank account held in the name of N.N., to Fox River State Bank, with the intent that the funds be used as a partial payment on a loan that the defendant had fraudulently originated in the name N.N. at Fox River State Bank, without N.N.'s knowledge or consent.

(13)    By way of this transaction, the defendant intended to conceal, and did conceal the fact that he had fraudulently originated the loan for N.N. at Fox River State Bank in the first instance.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE NOTICE

(14)    Upon conviction of the offense in violation of Title 18, United States Code, Section 1344, set forth in Count 1 of this information, the defendant, James Scalzo, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

(15)    Upon conviction of the offense in violation of Title 18, United States Code, Section 1956, set forth in Count 2 of this information, the defendant, James Scalzo, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense and any property traceable to such property.

5

(16)    If any of the property described above, as a result of any act or omission by the defendant cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

6.    The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses set forth in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

Bank Fraud

During the years 2008 and 2009, while he was employed as a commercial loan officer, James Scalzo originated and approved a series of loans for bank customers who were either unaware that the loans had been originated in their names, or who were unqualified to receive loans under bank's underwriting criteria. In each case, James Scalzo used a portion of the funds from the loan for his own benefit.

The N.N. Loans

James Scalzo originated three fraudulent loans on behalf of his cousin, N.N., who was unaware of Scalzo's conduct. The first loan was a line of credit in the amount of $85,000, originated by Scalzo at Fox River State Bank (FRSB), a federally insured financial institution.

6

Scalzo told N.N. that he transferred a legitimate $45,000 loan in N.N.'s name from the Bank of Kenosha (BOK) to FRSB when Scalzo left BOK and took a position as a vice president of commercial loans at FRSB. In reality, Scalzo paid off the $45,000 loan with funds from a line of credit that Scalzo held at a different financial institution, and then he reimbursed himself with funds from the new $85,000 line of credit that he originated in N.N.'s name.

Scalzo originated the $85,000 line by forging N.N.'s signature on the new loan documents. Scalzo also directed that funds from this line of credit be paid to accounts that he controlled, and accounts in which he had an interest. To do so, he sent e-mails to a personal banker at FRSB, stating that the withdrawal requests had been made by N.N.

When the interest payment came due on the $85,000 line, Scalzo originated a new line of credit for N.N. in the amount of $145,000, again by forging N.N.'s signature on the loan documents. This transaction is charged as Count One of the Information. From this new line, Scalzo paid off the $85,000 line and again directed that some of the funds be transferred to accounts that Scalzo controlled and in which he had an interest.

Scalzo originated the third loan at the Consumer's Community Credit Union (CCU), a federally insured financial institution, after Scalzo left FRSB and took a position as a banker at CCU. By that time, N.N. had learned of the $145,000 credit line and was being pressured by FRSB for payment. N.N. confronted Scalzo who promised to obtain funds to pay off the loan.

To meet N.N.'s demands and to conceal his role in the creation of the fraudulent loans, Scalzo first obtained funds to make a partial payment on the $145,000 line. He did so by fraudulently acquiring a loan in his mother's name at a different financial institution. This transaction is more fully described below in the section on money laundering.

7

Scalzo then originated a $135,000 loan in N.N.'s name at CCU in order to cover the balance of funds due at FRSB. Scalzo originated the CCU loan by forging N.N.'s signature on the loan documents. Scalzo also pledged the home of N.N.'s elderly parents as collateral for this loan, and he forged the signatures of the elderly N's on the document giving CCU a mortgage on the home. Scalzo used the loan funds to satisfy the balance of N.N.'s $145,000 line of credit at FRSB The $135,000 CCU loan went unpaid, and eventually CCU foreclosed on the elderly N's home.

From the approximately $365,000 in loan funds that Scalzo generated by way of the three N.N. loans, Scalzo arranged for the use of approximately $265,000 to pay off the earlier N.N. loans (specifically, the $85,000 line of credit created funds to pay off the $45,000 BOK loan; the $145,000 line of credit created funds to pay off the $85,000 FRSB loan; and the $135,000 CCU loan created funds to pay off the $145,000 FRSB loan.) From the remaining funds, Scalzo spent approximately $70,000 on expenses related to rental properties that he jointly owned with N.N. and N. N.'s brother, J.N., in an LLC known as JNJ Cucina. Scalzo had told his two cousins that a man named S.N. was purchasing the properties on a land contract and was making the JNJ Cucina mortgage payments until S.N. could obtain his own mortgage. In reality, S.N. would never qualify for any mortgage loan, and although S.N. was collecting the rent for the properties, S.N. was falling behind on the cousins' joint mortgage obligations. N.N. was unaware that a loan or loans acquired in his name were being used, in part, to make payments on obligations that he understood S.N. to have assumed.

Additionally, Scalzo directed that $8,000 from the N.N. loans be deposited into an account for M.C., who was Scalzo's business partner in an entity known as J&M Landholdings.

8

N.N. did not know M.C. and had no interest in J&M Landholdings. Scalzo also directed that $19,500 be deposited into the J&M Landholdings account at First Banking Center.

Other Borrowers

During his time at FRSB, Scalzo also originated credit lines for other borrowers who, although they were knowing borrowers, were unqualified under the bank's underwriting criteria. These borrowers included S.N., the purported land contract purchaser, for whom Scalzo approved a $100,000 line of credit; C.P., for whom Scalzo approved a $125,000 line of credit, and then a second, $158,000 line of credit; and P.D., for whom Scalzo approved a $230,000 line of credit. In each case, Scalzo directed that a portion of the loan proceeds be transferred to accounts he controlled or in which he had an interest.

From the S.N. line of credit, approximately $7,600 was applied to the obligations of JNJ Cucina; $1,500 was applied against Scalzo's personal line of credit at Southport Bank; and $4,500 was deposited into the account of J&M Landholdings. The remainder was used by S.N. for unknown purposes. From the C.P. lines of credits, $16,000 was deposited into the account of J&M Landholdings. From the P.D. line of credit, $35,500 was deposited into the account of J&M Landholdings.  None of these three borrowers had any interest in, or relationship to M.C. or J&M Landholdings.

During the summer of 2009, while Scalzo was still employed at FRSB, bank regulators observed that his portfolio contained a number of loans with no supporting financial information and with inadequate or absent collateral. Scalzo became aware that these customers, including C.P. and P.D., were being contacted by senior bank officials and asked to shore up their loan files, and eventually, to make payment on the loans.

9

After he moved to CCU, Scalzo arranged a new loan for C.P. in the amount of $230,000, to create funds so that C.P. could pay off the earlier line of credit at FRSB, and he arranged a new loan for P.D.'s parents, in the amount of $250,000 to create funds so that P.D. could pay off the earlier loan at FRSB. C.P. and P.D. did use these new loan funds to pay off their credit lines at FRSB. Eventually both of these CCU loans went into default.

<u>Money Laundering</u>

At the point in time that FRSB officials were seeking payment on N.N.'s $145,000 line of credit, they were also seeking payment on S.N.'s $100,000 line of credit. In order to conceal his participation in the fraud, Scalzo sought and obtained a line of credit in his mother's name at the Citizen's Bank of Mukwonago. He did so by forging her name and the name of her late husband's business partner on a document pledging as collateral, property that they jointly owned. This activity constitutes bank fraud in violation of 18 U.S.C. § 1344. Scalzo then disbursed funds from the line of credit as follows. First he wired $20,000 to the personal account of N.N. at TCF bank and directed N.N. to wire the money to FRSB as partial payment against the $145,000 line of credit. This second financial transaction is charged as Count Two of the information. Scalzo told N.N. that Scalzo had funds to make payment on the loan, but that Scalzo could not wire the money directly because FRSB would recognize his name on the wire and become alerted to his conduct.

Scalzo further wired $110,000 to a credit union account held by S.N.'s aunt and directed her to use the funds to pay off S.N.'s $100,000 line of credit at FRSB. These financial transactions were also intended to conceal Scalzo's involvement in the initial fraud.

10

Eventually all of the above described fraudulent loans which Scalzo created at FRSB were paid, but the loans he arranged at CCU went into default, and CCU, along with the elderly N's and others sustained losses which totaled more than $400,000.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in these offenses.

## PENALTIES

7.     The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fine: count one: 30 years and $1,000,000; count two: 20 years and the greater of $500,000 or twice the amount of the laundered funds. Count one also carries a maximum of 5 years supervised release and count two carries a maximum of 3 years supervised release. Each count also carries a mandatory special assessment of $100.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of bank fraud in violation of Title 18, United States Code, Section 1344(2), the government must prove each of the following elements beyond a reasonable doubt:

First, that there was a scheme to defraud a financial institution or to obtain funds under the custody and control of a financial institution by means of material false or fraudulent pretenses, representations or promises as charged;

Second, that the defendant executed the scheme;

Third, that the defendant did so knowingly with the intent to defraud; and

11

Fourth, that at the time of the charged offense, the deposits of the financial institution were insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund.

The parties understand and agree that in order to sustain the charge of Money Laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), the government must prove each of the following elements beyond a reasonable doubt:

First, that the defendant conducted or attempted to conduct a financial transaction;

Second, the transaction involved the proceeds of specified of unlawful activity;

Third, the defendant knew that the property involved in the financial transaction involved the proceeds of some form of illegal activity; and

Fourth, the defendant conducted the financial transaction in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5.

12

The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the

sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Offense Level

16.     The parties acknowledge and understand that the government will recommend to the sentencing court that the applicable base offense level for the offense of bank fraud charged in count one is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1) and that the following adjustments apply: a 14-level increase under Sentencing Guidelines Manual § 2B1.1(b)(H), as the loss was more than $400,000 but less than $1,000,000; a 2-level increase under Sentencing Guidelines Manual § 3B1.3 for Abuse of Position of Trust; as the defendant committed these offenses while he was employed in a position of private trust as a bank officer; and a 2-level increase under Sentencing Guidelines Manual § 3A1.1(b)(1) for Vulnerable Victim, as the fraud victims include an elderly couple, for a total offense level of 25. The defendant will not join this recommendation.

17.     The parties further acknowledge and understand that the government will recommend to the sentencing court that the applicable offense level for the offense of money laundering charged in count two, is 25, which is the offense level for the underlying bank fraud offense under Sentencing Guidelines Manual § 2S1.1(a)(1), and that a 2-level increase is applicable under Sentencing Guidelines Manual § 2S1.1(b)(2)(B), as the defendant will be convicted under 18 U.S.C. § 1956, for a total offense level of 27. The defendant will not join this recommendation.

14

## Acceptance of Responsibility

18.     The government agrees to recommend a 2-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the 2-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional 1-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

21.     The parties acknowledge and understand that the government will recommend a sentence within the applicable sentencing guideline range, as determined by the court. The defendant will not join this recommendation.

## Court's Determinations at Sentencing

22.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing

15

court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.  If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

25.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

16

## Fine

26.     The parties acknowledge and understand that in light of the anticipated restitution order, the government will recommend to the court that no fine be imposed on the defendant

## Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## Restitution

28.     The defendant agrees to pay restitution as ordered by the court. The defendant agrees that such restitution shall include any losses sustained by Fox River State Bank and Consumer's Credit Union as the result of fraud attributable to the defendant in the loans he originated while in their employ during the time period encompassed by the information; losses sustained by N.N. and the elder N's as the result of fraud attributable to the defendant as described in this plea agreement; and losses sustained by any other person directly harmed by the defendant's conduct in furtherance of the fraud scheme.

The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

17

## DEFENDANT'S COOPERATION

29.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion,  as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would

18

instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31.  The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.  The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

19

33.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

34.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

35.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

20

38.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

39.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to limit the number of charges is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

21

## VOLUNTARINESS OF DEFENDANT'S PLEA

40.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12-14-12

_____
JAMES SCALZO
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12-14-12

_____
MICHAEL J. COHN
Attorney for Defendant

For the United States of America:

Date: 12/18/12

_____
JAMES L. SANTELLE
United States Attorney

Date: 12·18·12

_____
CAROL L. KRAFT
Assistant United States Attorney

23